NOT DESIGNATED FOR PUBLICATION

No. 116,504

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHRISTOPHER BOOTHBY,
*Appellant*.


MEMORANDUM OPINION

Appeal from Stevens District Court; CLINTON B. PETERSON, judge. Opinion filed February 9, 2018. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Paul F. Kitzke*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., HILL, J., and WALKER, S.J.

PER CURIAM: Christopher Boothby appeals from his conviction of aggravated assault. He argues that the district court erred: by failing to instruct the jury on assault as a lesser included offense; by admitting irrelevant evidence that Boothby had a marijuana pipe on his person when he was arrested two days after committing this crime; and that the cumulative effect of these errors requires reversal. But because we find no errors which require reversal, Boothby's conviction is affirmed.

On June 8, 2014, Boothby arrived at the home of Gena and Jason Burnett. Jason and Boothby are first cousins. Gena was home at that time and saw Boothby's truck pull

1

into the driveway. Boothby sat in his truck for quite a while but eventually entered the house and came to the kitchen. He opened the refrigerator and started looking through it. Gena and one of her sons asked Boothby questions, but he did not respond. After a while, Boothby walked out of Gena's house, opened the door to his truck, and stood by the open door for approximately 10 minutes.

Gena went outside and asked Boothby what he was doing. Boothby was teary eyed and talked to her about being confused. She noticed that he had several guns on the seat of his truck, which made her nervous. Boothby had his knife out and was cleaning his fingernails with it. At one point, Boothby became angry and asked her if she knew anything about schizophrenia. He took the knife in his hand and flicked it, pretending to stab at the headrest in his truck. Gena testified that he did this action twice. Boothby also said that he had almost slit a girl's throat one time but that he did not do it. This was not normal behavior for Boothby, and it scared Gena. After talking to Gena for a while, Boothby calmed down, said he had to leave, got in his truck, and drove off.

Boothby then drove to the house where his cousin, Crystal Burnett, lived. Crystal is Jason's sister. Crystal has muscular dystrophy and scoliosis. She cannot walk and only has limited use of her arms, so she requires an electronic wheelchair to move around. Although it had been about a month since Boothby had last been at Crystal's house, it was not odd for him to show up there. Crystal was home alone at that time. When Boothby walked in, she was picking up some things and putting them in a drawer. Boothby came over and helped her pick up. He was really quiet and did not talk to her. After he helped pick up, he sat down on the couch in the living room. Boothby—who was normally talkative, loud, and happy—did not even answer when she said, "'Hey, Chris.'" Eventually, she asked him what he was doing, and he said that Jason had sent him over to talk to her. She thought that was odd because ordinarily Jason would not do that.

Boothby had a broken cigarette in his mouth. Crystal asked him what it was and whether it was a broken cigarette. Instead of answering her, Boothby walked into the dining room where there was a trash can, took out his knife, and cut the broken part off of the cigarette. At one point he looked over at Crystal, who was watching him the whole time. After that, Boothby kept the knife in his hand. He then turned his body and walked toward Crystal in her wheelchair with the knife in his hand. He held the knife about the level of his waist or hip, pointed out and down a little. When Boothby turned toward Crystal, she was nervous and uneasy. Boothby stopped approximately a couple of steps from her, still without saying a word to her. He stood there for around 30 seconds, staring at her with a blank expression on his face. Crystal was really scared at that point, and she thought Boothby might stab her or was thinking about stabbing her.

After about 30 seconds, Boothby put the knife away and gave Crystal a hug. He told her he loved her. She then asked him if they could go outside because it was hot in the house. She also wanted to go into her backyard because her neighbors were usually outside. When Crystal went into the backyard, Boothby did not immediately follow her. Crystal called her mom on her cell phone, but her mom did not answer. She called her mom so that if Boothby came outside, she could say that her mom had just called her. Boothby came outside after a few minutes and continued staring off into space. Crystal asked him what was up, and he came over and knelt down in front of her. He put his hands on both sides of her chair and said he wanted to apologize. She asked him for what, and he stated, "'For threatening your life.'" She asked him if he threatened her life, and he said, "'Yes, I did.'"

Crystal tried having a conversation with Boothby after that, but he would hardly answer and kept staring blankly. He asked Crystal to help him change the password on his phone, which she attempted to do. Eventually, Boothby came over and knelt in front of her again. He then said, "'I want to tell you I'm really struggling with something.'" She asked him what he was struggling with, and he answered, "'You know." She asked,

3

"'Taking my life?'" Boothby either said, "'Yes,'" or shook his head in the affirmative. Crystal asked him why he was contemplating taking her life, and Boothby answered that he was mad at her brother, Jason, and it would hurt him if he killed her. At that point, Boothby left. Crystal called her mom to come over, reentered the house, and locked her doors.

Crystal did not call 911 to report Boothby's action. Instead, she talked to Gena the next day—June 9, 2014—and they decided to report Boothby's actions to the sheriff's department. On June 10, 2014, Jason was at Crystal's house when Boothby came to the house. Jason and Crystal did not want Boothby to know they were calling the police, so Gena called 911 to report that he was there. Stevens County Sheriff's Detective Duane Topliss arrested Boothby at Crystal's residence on June 10, 2014.

The State later filed a complaint against Boothby charging him with aggravated assault. The district court held a jury trial in the case on November 16, 2015. Detective Topliss testified that after he took Boothby into custody and placed him in his vehicle, Boothby stated, "'This is about Crystal, isn't it?'" At that time, Detective Topliss had not told Boothby why he had arrested him. Once he transported Boothby to the sheriff's department, Topliss interviewed Boothby about the events of June 8. He asked Boothby what happened involving Crystal that day. Initially, Boothby said he did not do anything. Detective Topliss asked Boothby if he pulled a knife on Crystal and he said, "'No, not that I remember.'"

Gena testified about Boothby's actions at her house on June 8, 2014. Gena testified that Boothby's actions scared her and that he was not acting normal. Boothby came back to Gena's house later that same day when Jason was home, and Jason met him outside. He asked Boothby what was up, and Boothby just kept repeating, "'You know what,'" until he finally got in his truck and drove away. She testified that she had been friends with Crystal since they were five years old.

4

Crystal testified next about Boothby coming into her house and pointing his knife at her, which made her nervous and uneasy. She testified that when Boothby was standing a few steps away from her with his knife out, she was really scared, and she thought he might stab her or was at least thinking about stabbing her.

Crystal testified about Boothby's actions after putting the knife away, including him apologizing for threatening her life and telling her that he was struggling with wanting to take her life. On cross-examination, Crystal testified that Boothby did not thrust the knife at her, nor did he hold the knife up over his head in an offensive move. Although she testified that the knife was angled up, she said that Boothby did not make any kind of motion outward or forward.

After the State rested, defense counsel asked the district court to enter an order of acquittal, arguing that no reasonable person would find Boothby guilty on the evidence presented. The district court denied the motion.

Boothby testified in his own defense. He stated that on June 8, 2014, he was getting ready to leave for a job in Texas, so he stopped by Crystal's house to tell her goodbye. He testified that he helped Crystal pick up, like she said, and then he took out his knife to cut off part of the cigarette he had in his mouth. Boothby testified that when he was done, he put his knife back in its sheath before he walked towards her. She wanted to go outside, so they did. He testified that he had just stopped taking a lot of medication, which would explain why she said he had a blank stare. Stopping the medication had that effect on him. He testified that after they were outside for a while, he reached down to give her a hug and told her he loved her and would see her later. Then he left.

On cross-examination, Boothby testified that he never said he wanted to slit someone's neck when he was at Gena's house. He testified that he talked about hearing

5

voices, but he never said that one of the voices told him to cut someone's neck. He testified that he had a different knife out at Gena's house. It was a knife that could flip open and closed, and he only hit it on the headrest to close it.

Boothby further testified that he heard Jason's voice on the day he was at Crystal's house. He stated that it was telling him to do "[a]ll kinds of stuff." But it did not tell him to harm Crystal. He then testified that he thought Jason put an electronic bug in his ear that was still there. He testified that the bug in his ear had told him to go to Crystal's house and have her change his passwords on his phone, which Crystal had testified that he asked her to do.

The defense rested. During the instructions conference, Boothby requested that the jury be instructed on assault as a lesser included offense of aggravated assault. The district court declined to give the lesser included instruction, stating that if the jury believed that an assault occurred, then it was committed with a deadly weapon. The jury returned a verdict finding Boothby guilty of aggravated assault.

On June 3, 2016, the district court sentenced Boothby to 29 months in prison. Boothby has timely appealed his conviction and sentence.

*The district court's refusal to instruct on the lesser included offense of simple assault*

Boothby first argues that the district court erred in failing to instruct the jury on assault as a lesser included offense of aggravated assault.

There are multiple steps with different standards of review when addressing a district court's failure to give a jury instruction. First, appellate courts utilize an unlimited standard of review to determine whether the party preserved the issue. Next, the court considers the merit of the claim, deciding whether error occurred below. In this step, the

court must determine if the instruction was legally appropriate with an unlimited standard of review and whether there was sufficient evidence, viewed in the light most favorable to the requesting party, to support the instruction. Finally, if this court determines the district court erred, it must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011). *State v. Dupree*, 304 Kan. 377, 402-03, 373 P.3d 811 (2016); *State v. Fisher*, 304 Kan. 242, 256-57, 373 P.3d 781 (2016).

Boothby properly preserved this issue by requesting an instruction on assault as a lesser included offense. See K.S.A. 2016 Supp. 22-3414(3); *State v. Roeder*, 300 Kan. 901, 920, 336 P.3d 831 (2014). So we must next decide whether the instruction was legally and factually appropriate. *Dupree*, 304 Kan. at 392. If we find the instruction to be legally and factually appropriate, the district court's failure to give the instruction constitutes error. *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012).

There is no question that assault is a legally appropriate lesser included offense of aggravated assault. See K.S.A. 2016 Supp. 21-5109(b); K.S.A. 2016 Supp. 21-5412; *State v. Simmons*, 295 Kan. 171, 175, 283 P.3d 212 (2012). The State concedes this point. We thus proceed to the question of whether it was factually appropriate to instruct on assault in this case.

The district court must instruct the jury on lesser included offenses where there is some evidence that would reasonably justify a conviction of the lesser included offense. K.S.A. 2016 Supp. 22-3414(3); *State v. Armstrong*, 299 Kan. 405, 432, 324 P.3d 1052 (2014). The Kansas Supreme Court also has held that the following test applies when evaluating whether a lesser included instruction is factually appropriate in the case: "If, after a review of all the evidence viewed in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found the defendant guilty of the

lesser crime, failure to give the instruction is error. [Citation omitted.]" *Fisher*, 304 Kan. at 258.

Assault is knowingly placing another person in reasonable apprehension of immediate bodily harm. K.S.A. 2016 Supp. 21-5412(a). Aggravated assault, as charged against Boothby, is assault committed with a deadly weapon. K.S.A. 2016 Supp. 21-5412(b)(1). The issue, therefore, is whether there was any evidence of an assault occurring without a deadly weapon.

Boothby argues that if there was evidence to support a conviction for aggravated assault, "there is little doubt that it would support a conviction for simple assault." According to Boothby there was evidence produced at trial that supports his argument. He points out that Crystal testified that she was afraid of Boothby because of his odd behavior regardless of the presence of the knife. Crystal also testified that initially it was Boothby's face and blank stare that made her nervous. Moreover, Boothby notes that he testified he did not approach Crystal with the knife. Boothby maintains that based on this testimony, viewed in the light most favorable to him, the jury could have formed a reasonable doubt that he used a knife but still believed that he placed Crystal in reasonable apprehension of bodily harm as a result of his odd behavior. Thus, he claims that an instruction on simple assault was factually appropriate.

The State argues that although Crystal testified on cross-examination that Boothby's actions made her scared regardless of the knife, she still testified that he had a knife. The State points out that Crystal testified that Boothby not talking to her when he was holding the knife was what caused her concern. Moreover, the State notes that although Boothby testified he did not point the knife at Crystal, he also admitted that he had the knife out in the living room. Additionally, Boothby told Crystal that he was struggling with a desire to kill her and apologized to her for threatening her life. The

State maintains that it was not possible for the jury to find simple assault with the facts presented at trial.

We concur with the State's analysis of these events. As noted above, under Kansas law the crime of assault requires that a defendant knowingly place another in reasonable apprehension of *immediate bodily harm*. K.S.A. 2016 Supp. 21-5412(a). No evidence was presented that supports a finding that Boothby knowingly placed Crystal in reasonable apprehension of immediate bodily harm with any action other than by advancing to within a couple of steps of her while holding a knife pointed at her. Although Crystal testified that some of Boothby's other actions were odd or made her nervous, the only evidence of any action that placed her in reasonable apprehension of *immediate bodily harm* was Boothby's wielding of the knife. The district court correctly determined that an instruction on assault was not factually appropriate. Thus, it did not err in failing to instruct the jury on assault as a lesser included offense.

*Admission of drug paraphernalia evidence.*

Boothby's second argument on appeal contends that the district court erred in admitting evidence that the officers who arrested him found a marijuana pipe on his person. An appellate court exercises de novo review of a challenge to the adequacy of the legal basis of a district judge's decision on admission or exclusion of evidence. *State v. Bowen*, 299 Kan. 339, 349, 323 P.3d 853 (2014).

Boothby objected to the admission of this evidence when the State presented it at trial and argued that it was irrelevant to the charges in this case. Specifically, when Detective Topliss testified about arresting Boothby, the prosecutor asked him what he found during the pat-down. Detective Topliss responded:

9

"We found a buck knife that was in a [sheath] or a case, whatever you want to call it, attached to his belt on his right hip. We found two .22 magazines, a .45 magazine in his left rear pocket, we found a suspected marijuana pipe in his front left pocket, and some change and things like that."

The district court then admitted into evidence the knife that Detective Topliss testified was the knife he took from Boothby. Next, the prosecutor attempted to admit the .22 magazines and the .45 magazine as exhibits, but the district court sustained defense counsel's objection to the admission of the exhibits as irrelevant.

Continuing, the prosecutor asked to admit as an exhibit what Detective Topliss testified from his training and experience was a marijuana pipe. Defense counsel objected to the relevance of this exhibit, arguing that there was no charge based on the marijuana. The prosecutor responded: "Your Honor, I think this is a misdemeanor charge and I think that the State has the option to add that charge until it's presented to the jury and if we elect to add a misdemeanor, we have that option." The district court admitted the pipe. Afterward, Detective Topliss explained that the admitted exhibit was the marijuana pipe he found in Boothby's pants pocket. The marijuana pipe was never mentioned again, and the record does not reflect that the State attempted to amend the complaint to include a charged based on the pipe.

Boothby argues that K.S.A. 22-3201(e) only allows the district court to amend the complaint before the verdict if no additional or different crime is charged. Moreover, Boothby argues that even if the State could have amended the complaint, it never amended it to add a charge based on the marijuana pipe, so the evidence of this uncharged crime remained immaterial and, therefore, inadmissible.

The State admits that "admission of the marijuana pipe was likely inappropriate because it was not relevant to proving the aggravated assault." In fact, the only argument

10

the State makes on appeal is that the evidence did not prejudice Boothby, so its admission was harmless.

The erroneous admission of evidence is subject to review for harmless error under K.S.A. 2016 Supp. 60-261. *State v. Longstaff*, 296 Kan. 884, 895, 299 P.3d 268 (2013). If the error implicates a constitutional right, the effect of that error must be assessed under the constitutional harmless error standard, which requires the party benefiting from the error to prove beyond a reasonable doubt that the error would not or did not affect the outcome of the trial in light of the entire record. *State v. Santos-Vega*, 299 Kan. 11, 23-24, 321 P.3d 1 (2014). If the error does not implicate a constitutional right—and Boothby does not argue that this error affects his constitutional rights—the district court should apply K.S.A. 2016 Supp. 60-261 and determine if there is a reasonable probability that the error affected the outcome of the trial in light of the entire record. *Longstaff*, 296 Kan. at 895.

To be safe, an appellate court may begin the harmlessness analysis using the constitutional harmless error standard. If the appellate court concludes that the error is not harmless and reverses the convictions, there is no point in analyzing whether the State met the lower standard for harmlessness under K.S.A. 2016 Supp. 60-261. *State v. Logsdon*, 304 Kan. 3, 40, 371 P.3d 836 (2016).

In arguing that the admission of the marijuana pipe prejudiced his trial, Boothby contends that it is similar to the erroneous admission at trial of evidence of other crimes committed by the defendant. In *State v. Gunby*, 282 Kan. 39, 48-49, 144 P.3d 647 (2006), the Kansas Supreme Court stated that prior crimes evidence can be problematic because the jury might conclude that a defendant deserves punishment because he or she is a general wrongdoer even if the State did not establish the defendant's guilt beyond a reasonable doubt. Or a jury might believe that because a defendant is a criminal, the evidence put in on his or her behalf should not be believed. 282 Kan. at 48-49. Boothby

11

argues that the jury might have convicted him because it concluded that he deserved punishment even if the actual charges were not proved in this case. Moreover, he claims that the improper admission of other crimes evidence could have impaired his credibility when his case depended on a credibility battle between Crystal and himself.

The State argues that Boothby lacked credibility based solely on his testimony at trial. The State contends that Boothby's testimony was highly unusual and outlandish, specifically his belief that Jason had installed an electronic bug in his ear and was transmitting voices into his head. The State maintains that based on these claims, it was unlikely that the jury discounted his testimony based on the fact that he had a marijuana pipe in his possession when he was arrested. The State also argues that it was unlikely that the jury would punish Boothby for possessing the marijuana pipe when it was mentioned only once at the beginning of the testimony and was never mentioned again by any witness or in closing arguments.

At the outset, we conclude that it was erroneous for the district court to have admitted evidence concerning discovery of the marijuana pipe in Boothby's possession. But, considering the evidence presented at trial as a whole, we believe it is unlikely that the jury's conviction for aggravated assault was in any way based on the evidence that Boothby had a marijuana pipe on him when he was arrested. Crystal testified that Boothby held a knife up to her, and then he later apologized for threatening her life and explained to her that he had been thinking about killing her. The State has proved beyond a reasonable doubt—or has at least proven a reasonable probability—that the error did not affect the outcome of the trial in light of the entire record. We are persuaded that the State has met its burden under both K.S.A. 2016 Supp. 60-261 and the constitutional harmless error standard.

*Cumulative errors*

Boothby finally argues that his conviction should be reversed based on the cumulative effect of trial errors.

> "When a party argues that the cumulative impact of alleged errors is so great that they result in an unfair trial, this court aggregates all the errors and, even if those errors individually would be considered harmless, analyzes whether their cumulative effect is so great that they collectively cannot be determined to be harmless. In undertaking such an analysis, this court reviews the entire record and exercises unlimited review. [Citations omitted.]" *State v. Sean*, 306 Kan. 963, 993, 399 P.3d 168 (2017).

Here, there is no cumulative error. Although the district court erred in admitting evidence of the marijuana pipe, the error was harmless and there was no other error. A single error cannot constitute cumulative error. *State v. Love*, 305 Kan. 716, 737, 387 P.3d 820 (2017). We believe Boothby was given a fair trial, and there are no cumulative errors which require reversal.

Affirmed.